# United States Court of Appeals
## For the First Circuit

No.  13-1149

GRAND WIRELESS, INC.,

Plaintiff, Appellee,

v.

VERIZON WIRELESS, INC.; ERIN McCAHILL,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Torruella, Ripple[*] and Thompson,
Circuit Judges.

Philip R. Sellinger, with whom David G. Thomas, Zachary C. Kleinsasser, Todd L. Schleifstein and Greenberg Traurig, LLP were on brief, for appellants.
Samuel Perkins, with whom Brody, Hardoon, Perkins & Kesten, LLP was on brief, for appellee.

March 19, 2014

---

[*]  Of the Seventh Circuit, sitting by designation.

**RIPPLE, <u>Circuit Judge</u>**.  Grand Wireless, Inc. ("Grand") brought this action in Massachusetts state court against Verizon Wireless, Inc. ("Verizon") and Verizon employee Erin McCahill.  It alleged a violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") against Ms. McCahill, as well as several state law claims against both Ms. McCahill and Verizon.  The defendants removed the case to the United States District Court for the District of Massachusetts and moved for an order compelling arbitration of Grand's claims.  Grand opposed the motion.  It contended that the arbitration clause should be interpreted narrowly and that, because Ms. McCahill was not a signatory to the contract containing the arbitration clause, the claim against her could not be arbitrated in this case.  Adopting Grand's memorandum in opposition to the motion, the district court denied the defendants' motion to compel and also denied their subsequent request for reconsideration.

The defendants timely appealed.  They submit that Grand's claims were within the scope of the parties' arbitration agreement and that arbitration of the claims against Ms. McCahill is not barred despite her status as a non-signatory of the arbitration agreement.  We agree and therefore reverse the judgment of the district court and remand the case for further proceedings.

## BACKGROUND

### A. Facts

In September 2002, Grand and Verizon entered into an Exclusive Authorized Agency Agreement for Commercial Mobile Radio Service ("Agreement"). The Agreement authorized Grand to act as a Verizon sales agent within a defined geographic area. The Agreement governed the business relationship between Grand and Verizon. It required Grand to provide services exclusively for Verizon by offering customers Verizon services, such as sales, installation, warranty service and equipment maintenance. The Agreement also addressed the relationship between Grand, Verizon and subscribers who purchased products and services through Grand. On this point, the Agreement provided that subscriber lists were "the exclusive confidential property of Verizon Wireless."[1] The Agreement provided for an initial term of five years; at that point, the Agreement would continue on a month-to-month basis, terminable by either party on thirty days' written notice to the other.

The Agreement contained a provision entitled, "DISPUTE RESOLUTION AND ARBITRATION." It stated, in pertinent part:

> Except to the extent explicitly provided below, ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY PRIOR OR

---

[1] R.20-1 ¶ 3.3.

FUTURE AGREEMENT BETWEEN THE PARTIES, SHALL BE SETTLED BY ARBITRATION ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") IN ACCORDANCE WITH THE WIRELESS INDUSTRY ASSOCIATION ("WIA") RULES OF THE AAA, AS MODIFIED BELOW, AND JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATORS MAY BE ENTERED IN ANY COURT HAVING JURISDICTION.[2]

The subsequent paragraphs explicitly stated that the disputes not covered included several intellectual property issues, as well as "[s]eeking to compel arbitration";[3] "[s]eeking to confirm or challenge any arbitral award";[4] seeking judicial relief for breaches of sections 3.3 and 7 of the Agreement; and seeking emergency injunctive relief pending the appointment of arbitrators. Provisions followed addressing the procedural aspects of commencing and conducting arbitration.

There is no dispute that, under the Agreement, Grand operated retail locations for Verizon products and services beginning in 2002 until the five-year term expired in September 2007. The parties then continued their relationship on a month-to-month basis until July 19, 2011, when Verizon notified Grand of its intent to terminate the relationship. Verizon submits that at Grand's request, Verizon extended the termination date to October 31, 2011, in order to "g[i]ve Grand additional time to

---

[2] Id. ¶ 15.

[3] Id. ¶ 15.2.1.

[4] Id. ¶ 15.2.2.

-4-

attempt to sell certain of its stores to another Verizon Wireless agent."[5]

> In October 2011, according to Grand's complaint:
>
> [Verizon] mailed an oversized (6" by 11") color postcard, featuring the picture of an attractive young woman, to the customers of eight remaining Grand Wireless stores, proclaiming that these Grand Wireless stores had "CLOSED." The mailing provided the customers with the address of the nearest competing Verizon Wireless store.[6]

Grand further alleged that Ms. McCahill had "authorized the mailing and knew when the mailing went out that it was false."[7] Grand stated that it was, at the time of the mailing, in negotiations with another wireless provider, T-Mobile, to become an authorized T-Mobile agent. Further, Grand alleged that Ms. McCahill knew that the mailing "would deal a body blow to Grand Wireless' ability [to] continue in business as a T[-]Mobile outlet" and that the mailing "was a deliberate attempt to eliminate Grand Wireless as a competitor to nearby Verizon stores."[8] Grand alleged that its T-Mobile venture failed and that it has since ceased operations.

---

[5] Appellants' Br. 7. Grand does not dispute this representation. See Appellee's Br. 2.

[6] R.15 at 17, ¶ 11.

[7] Id. at 17, ¶ 12.

[8] Id. at 17, ¶ 13.

## B. Procedural History

Grand initially filed the present action in Massachusetts state court. Its complaint alleged that Ms. McCahill had violated RICO, 18 U.S.C. §§ 1961 et seq., by "engag[ing] in a fraudulent scheme that used the United States mails to transmit false representations that 'GRAND WIRELESS . . . HAS CLOSED,' in violation of the federal mail fraud statute, 18 U.S.C. § 1341."[9] It further alleged that both Ms. McCahill and Verizon had violated a Massachusetts statute prohibiting unfair and deceptive trade practices. Finally, Grand alleged that both Ms. McCahill and Verizon had committed the torts of injurious falsehoods and intentional interference with an advantageous relationship.

The defendants removed the case to the district court, where Verizon and Ms. McCahill moved to compel Grand to arbitrate its claims. Grand opposed the motion for arbitration. It submitted that the motion to compel arbitration should be denied for two reasons: (1) that its claims fell outside of the scope of the arbitration clause; and (2) that Ms. McCahill could not enforce the arbitration clause because she was not a party to the Agreement.

Before the deadline had passed for the defendants to file their reply brief, the district court denied the motion to compel. In ruling, the district court did not issue a written opinion;

---

[9] Id. at 18, ¶¶ 16-17 (Count I).

-6-

instead, it simply issued an order stating, "Motion is denied. The court adopts Plaintiff's Memorandum. So ordered."[10] The defendants moved for reconsideration. The district court denied their motion in another order, stating, "Court has reconsidered Defendants' Motion to Compel Arbitration and to Dismiss Complaint or stay action pending arbitration and again denies same. So Ordered."[11] The defendants then brought this timely appeal.[12]

## II

### DISCUSSION

We have jurisdiction to review an order denying a motion under the Federal Arbitration Act to compel arbitration. See 9 U.S.C. § 16(a)(1)(C). Our review of such a denial is de novo because whether a matter is arbitrable is a matter of contract interpretation, and contract interpretation is a matter of law. Combined Energies v. CCI, Inc., 514 F.3d 168, 171 (1st Cir. 2008). To compel arbitration, the defendants "must demonstrate that a valid agreement to arbitrate exists, that the[y are] entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa &

---

[10] R.26.

[11] R.29.

[12] The district court stayed the proceedings pending resolution of this appeal.

-7-

<u>Casino</u>, 640 F.3d 471, 474 (1st Cir. 2011) (internal quotation marks omitted). Furthermore, as we also noted in <u>Soto-Fonalledas</u>:

> Under Section 2 of the FAA, a written provision in a contract "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has stated that "the FAA was designed to promote arbitration," and that "Section 2 embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts."

<u>Id.</u> (quoting <u>AT&T Mobility LLC</u> v. <u>Concepcion</u>, 131 S. Ct. 1740, 1749 (2011); <u>Buckeye Check Cashing, Inc.</u> v. <u>Cardegna</u>, 546 U.S. 440, 443 (2006)).

Here, the parties do not dispute the validity of the Agreement's arbitration clause. Instead, they dispute: (1) whether Grand's claims are within the scope of the arbitration clause; and (2) whether Ms. McCahill is entitled to invoke the arbitration clause. We address each contention in turn.

## A. Scope of the Arbitration Clause

We first address whether Grand's claims are within the scope of the arbitration clause. Grand and Verizon agreed to arbitrate "any controversy or claim arising out of or relating to" their Agreement.[13]

---

[13] R.20-1 ¶ 15. (These words appear in capital letters in the Agreement. We have employed regular typeface here and in later (continued...)

-8-

As we have noted earlier, the district court simply adopted Grand's memorandum. Therefore, the district court necessarily took that document's view that the Agreement's arbitration clause was narrow. Such a construction, according to that memorandum, would limit application of the arbitration clause to "battles over the Agency Agreement," i.e., to claims that require interpretation of the Agreement's terms.[14] The memorandum also asserted that narrow arbitration clauses are not entitled to a presumption of arbitrability.

In this appeal, Grand takes the same position that it did in the district court. The defendants contend, however, that Grand's claims "relate to" the Agreement because they involve matters that occurred during the course of the agency relationship. Specifically, Grand's claims concern Verizon's right to contact freely its customers and Verizon's termination of its relationship with Grand. The defendants also submit that the language of the arbitration clause is broad, and therefore the dispute is entitled to a presumption of arbitrability.

"Unless the parties clearly and unmistakably provide otherwise," AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986), the court must resolve a disagreement among the

---

[13](...continued)
uses of this quotation for readability.)

[14] R.23 at 5-6.

parties as to whether an arbitration clause applies to a particular dispute, Granite Rock Co. v. Int'l Bhd. of Teamsters, 130 S. Ct. 2847, 2857–58 (2010). "[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." Id. at 2856. "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995). We conduct our analysis with the federal policy in favor of arbitration in mind, such that, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985). "At a minimum, this policy requires that 'ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration.'" PowerShare, Inc. v. Syntel, Inc., 597 F.3d 10, 15 (1st Cir. 2010) (alteration in original) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 475–76 (1989)). This presumption in favor of arbitration applies unless the party opposing arbitration rebuts it. Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 379 (1st Cir. 2011); Paul Revere Variable Annuity Ins. Co. v. Kirschhofer, 226 F.3d 15, 25 (1st Cir. 2000) ("It is true that, generally speaking, the

presumption in favor of arbitration applies to the resolution of scope questions.").

To determine whether Grand's claims fall within the scope of the arbitration clause, "we focus on the factual allegations underlying [the] claims in the [c]omplaint." Dialysis Access Ctr., LLC, 638 F.3d at 378. Grand alleged that Verizon's "false and deliberate misrepresentation to Grand Wireless customers that Grand Wireless had ceased to do business" harmed Grand.[15] Grand made factual allegations regarding Verizon's termination of its relationship with Grand. The complaint described the customer mailing and Grand's belief that Verizon and Ms. McCahill knew that the mailing contained false information yet authorized its distribution in order to harm Grand in "a deliberate attempt to eliminate Grand Wireless as a competitor."[16]

Based on the allegations in Grand's complaint, resolution of this dispute will entail determining, at least, the status of Grand and Verizon's relationship as of October 2011, whether the customers contacted by Verizon were customers of Grand, the extent of Verizon's knowledge regarding Grand's transition of business to T-Mobile, and whether Grand's stores were, in fact, closed at the time of Verizon's mailing. These factual issues relate to the terms of the Agreement or, at a minimum, to the relationship

---

[15]  R.15 at 13.

[16]  Id. at 17, ¶ 13.

established between Grand and Verizon under the Agreement. Grand's allegations about Verizon's termination of their business relationship may implicate extensive portions of the Agreement concerning termination. Other allegations may require consideration of the portions of the Agreement regarding Verizon's rights with respect to customers obtained by Grand. Given that a number of factual disputes arising from Grand's claims likely will have to be resolved by reference to the Agreement, it is clear that Grand's claims "arise out of or relate to" the Agreement and therefore fall within the scope of the arbitration clause.

Even were we less sure of the arbitration clause's applicability to Grand's claims, we would apply the presumption of arbitrability here. See Kirschhofer, 226 F.3d at 25 (holding that the presumption of arbitrability is applied to scope questions that arise "when the parties have a contract that provides for arbitration of some issues and it is unclear whether a specific dispute falls within that contract" (internal quotation marks omitted)). This presumption is particularly appropriate where, as here, the arbitration clause is broadly worded. AT&T Techs., 475 U.S. at 650; see also Granite Rock, 130 S. Ct. at 2858 (characterizing an arbitration clause that covered "[a]ny claim, dispute, or controversy . . . arising from or relating to . . . the validity, enforceability, or scope of . . . the entire Agreement" as broad (emphasis added) (internal quotation marks omitted)). "An

order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960).  Thus, where the language of an arbitration clause is broad and "'[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'"  AT&T Techs., 475 U.S. at 650 (quoting Warrior & Gulf, 363 U.S. at 584-85).

Grand presents us with no such "forceful evidence" to rebut the presumption of arbitration.  Instead, it asks us to apply "conventional contract interpretation."[17]  In its view, the language "arising out of or relating to this agreement . . . unambiguously limits the scope of arbitrable claims to those [situations] which depend for resolution on interpreting or applying some provision of the Agency Agreement."[18]  Because "no provision of the Agency Agreement controls, is implicated, needs to be read or sheds any light on the adjudication of Grand's mail fraud claim," Grand

---

[17]  Appellee's Br. 14.

[18]  Id. at 4 (internal quotation marks omitted).

-13-

submits, its claims are not within the scope of the arbitration clause.[19]

We cannot accept Grand's view. As we discussed previously, resolution of some of the issues raised by Grand's claims may well require resort to the Agreement. Moreover, Grand's attempt at rebutting the presumption of arbitrability needed to show that the parties <u>intended to exclude</u> this type of dispute from the scope of the arbitration clause, <u>see</u> <u>AT&T Techs.</u>, 475 U.S. at 650, not merely that the arbitration clause lacked explicit language covering Grand's claims. Contrary to Grand's view, where arbitration clauses included broad language requiring arbitration of disputes "arising out of or relating to" parties' contracts, courts have found arbitration appropriate on a variety of claims similar to those presented here. <u>See, e.g.</u>, <u>Shearson/Am. Express, Inc.</u> v. <u>McMahon</u>, 482 U.S. 220, 223, 241-42 (1987) (holding that parties could be compelled to arbitrate RICO claims relating to, <u>inter alia</u>, making false statements and omitting material facts where brokerage agreement stated, "any controversy arising out of or relating to my accounts, to transactions with you for me or to this agreement or the breach thereof, shall be settled by arbitration" (internal quotation marks omitted)); <u>cf., e.g.</u>, <u>Commercial Union Ins. Co.</u> v. <u>Gilbane Bldg. Co.</u>, 992 F.2d 386, 387-88, 391 (1st Cir. 1993) (holding that defendant's Massachusetts

---

[19] <u>Id.</u> at 14.

-14-

unfair and deceptive trade practices counterclaim was subject to arbitration where clause covered "[a]ll claims, disputes and other matters in question arising out of, or relating to this Agreement or the breach thereof").

In sum, in adopting Grand's memorandum in opposition to the defendants' motion to compel arbitration, the district court approved Grand's statement that "Verizon unambiguously restricted the arbitration clause to battles over the Agency Agreement," and, therefore, the presumption of arbitrability would not enter into play.[20] This conclusion is unsupported by the case law and the facts of this case. The broad language of the arbitration clause presented here encompasses the dispute described in Grand's complaint.

## B. Ms. McCahill's Ability to Invoke the Arbitration Clause

The allegations against Ms. McCahill arise out of actions that she allegedly took as part of her employment by Verizon. She therefore wants to avail herself of the arbitration clause in the Agreement signed by her employer, Verizon. The district court, by adopting Grand's memorandum, must be understood to have ruled that the claims against Ms. McCahill are not covered by the arbitration clause because she was not a party to the Agreement and because the arbitration clause does not call specifically for arbitrating disputes with individual employees. Verizon and Ms. McCahill now

_____

[20] R.23 at 5-6.

-15-

challenge this determination. They take the view that, because Ms. McCahill was acting as an agent of Verizon and the claims against her "relate solely to her performance as an employee," she is entitled to invoke the arbitration clause.[21]

In order to compel arbitration of the claims against her, Ms. McCahill must establish that she is "entitled to invoke the arbitration clause." Soto-Fonalledas, 640 F.3d at 474 (internal quotation marks omitted). "[T]he FAA does not require parties to arbitrate when they have not agreed to do so . . . ." Volt Info. Scis., 489 U.S. at 478. "[N]or does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement." Id. We recognize that, of course, as a general proposition, a contract cannot bind a non-party. We also recognize, however, that "there are exceptions allowing non-signatories to compel arbitration" and that "[a] non-signatory may be bound by or acquire rights under an arbitration agreement under ordinary state-law principles of agency or contract." Restoration Pres. Masonry, Inc. v. Grove Eur. Ltd., 325 F.3d 54, 62 n.2 (1st Cir. 2003).[22]

---

[21] Appellants' Br. 24.

[22] Our decision in Restoration Preservation Masonry, Inc. v. Grove Europe Ltd., 325 F.3d 54, 62 n.2 (1st Cir. 2003), cites with approval cases from other circuits acknowledging that non-signatories may have rights under an arbitration contract under certain circumstances. See id. (citing Grigson v. Creative Artists Agency, 210 F.3d 524, 527 (5th Cir. 2000); Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993),

-16-

Grand's complaint makes clear that Ms. McCahill's alleged actions were taken in her capacity as Verizon's agent or employee. She allegedly mailed (or directed to have mailed) postcards to the company's customers while she was employed for the company and in furtherance of company business. These allegations form the sole basis of liability against Verizon and against Ms. McCahill. Grand, in naming Ms. McCahill in its complaint, identified her as "Director of Indirect Communication, Erin McCahill."[23] It further suggested that it was suing Ms. McCahill in her capacity as a Verizon agent when it stated that its claims were against Ms. McCahill "and all other [Verizon] executives who aided and abetted her in issuing the mailed announcements."[24]

Grand puts forward but <u>one</u> argument as to why Ms. McCahill cannot invoke the arbitration clause: that the mention of employees in certain parts of the Agreement, combined with the lack of mention of employees in the arbitration clause, makes clear that the parties never agreed that claims against employees--even

---

abrogated by <u>Lawson</u> v. <u>Life of the S. Ins. Co.</u>, 648 F.3d 1166, 1171 (11th Cir. 2011); <u>Hughes Masonry Co.</u> v. <u>Greater Clark Cnty. Sch. Bldg. Corp.</u>, 659 F.2d 836, 841 n.9 (7th Cir. 1981)). Additionally, in <u>Sourcing Unlimited, Inc.</u> v. <u>Asimco International, Inc.</u>, we noted that "[c]ourts routinely recognize that arbitration agreements may require arbitration even where all parties to the dispute did not sign the arbitration agreement." 526 F.3d 38, 46 n.8 (1st Cir. 2008) (citing <u>Zurich Am. Ins. Co.</u> v. <u>Watts Indus., Inc.</u>, 417 F.3d 682, 687 (7th Cir. 2005)).

[23] R.15 at 13.

[24] <u>Id.</u> at 18, ¶ 16.

those sued for actions taken within the scope of their employment--could avail themselves of the arbitration agreement. Evaluating Grand's contentions requires us to apply New York State law, which governs the interpretation of the contract. New York State requires that the contract be construed according to its plain meaning. MHR Capital Partners LP v. Presstek, Inc., 912 N.E.2d 43, 47 (N.Y. 2009). It permits the court to regard the plain wording of the instrument as well as its structure to ascertain that plain meaning. Niagara Frontier Transp. Auth. v. Euro-United Corp., 757 N.Y.S.2d 174, 176 (App. Div. 2003).

We have examined the Agreement from stem to stern, both with respect to its wording and with respect to its structure. We see no basis for Grand's assertion. In the contract, the parties do refer to employees in other contexts, such as ensuring that employees of Grand are not considered the employees of Verizon. Given the nature of the relationship established by the contract between the two companies, it is not at all surprising that this consideration would be the focus of special attention in the text of the agreement. The remaining references are likewise in areas where specific reference to employees would be expected. We fail to see how such references and the absence of an explicit reference to employees in the arbitration clause in any way evince an intent on the part of the parties to bar employees, acting in the scope of

-18-

their employment, from the protection of the arbitration clause adopted by their employer.

Verizon and Grand certainly wished to have their disputes settled by arbitration. Since Verizon could operate only through the actions of its employees, it would have made little sense to have agreed to arbitrate if the employees could be sued separately without regard to the arbitration clause. Notably, contrary to Grand's assertion, the arbitration clause is written in broad language to encompass "any controversy or claim arising out of or relating to" the Agreement. Moreover, the parties entered into this agreement knowing that the legal landscape recognized the right of employees to seek the protection of their employers' arbitration clauses.

Indeed, a number of our sister circuits have addressed this issue, and all have held that an agent is entitled to the protection of her principal's arbitration clause when the claims against her are based on her conduct as an agent.[25] When the non-signatory party is an employee of the signatory corporation and the underlying action in the dispute was undertaken in the course of the employee's employment, these circuits have fashioned,

_____

[25] See, e.g., Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1121 (3d Cir. 1993); Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1360 (2d Cir. 1993); Arnold v. Arnold Corp.-Printed Commc'ns for Bus., 920 F.2d 1269, 1281-82 (6th Cir. 1990); Letizia v. Prudential Bache Secs., Inc., 802 F.2d 1185, 1187-88 (9th Cir. 1986).

-19-

uniformly, a federal rule designed to protect the federal policy favoring arbitration. That rule, founded on general state law principles of agency, is that when "a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements." Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1121 (3d Cir. 1993). Such a rule is necessary, our sister circuits have reasoned, because a corporate entity or other business can only operate through its employees and an arbitration agreement would be a meaningless arrangement if its terms did not extend to them. See id. at 1122. Any other rule, in the view of these courts, would permit the party bringing the complaint to avoid the practical consequences of having signed an agreement to arbitrate; naming the other party's officers, directors or employees as defendants along with the corporation would absolve the party of all obligations to arbitrate. See, e.g., Arnold v. Arnold Corp.-Printed Commc'ns for Bus., 920 F.2d 1269, 1281 (6th Cir. 1990). Indeed, long before the signing of the contract in this case, our circuit, although not elaborating the rule or the reasons for it, had expressed its approval of the rule. Hilti, Inc. v. Oldach, 392 F.2d 368, 369 n.2 (1st Cir. 1968) ("If arbitration defenses could be foreclosed simply by adding as a defendant a person not a party to an arbitration agreement, the utility of such agreements would be seriously compromised.").

-20-

Notably, the highest court of New York State, the state whose law generally governs this contract in the absence of any federal preemption, has taken the view that the need to respect the basic policy of the FAA--the protection of the agreement to arbitrate-- requires the use of the federal rule articulated by these circuits. See Hirschfeld Prods., Inc. v. Mirvish, 673 N.E.2d 1232, 1233 (N.Y. 1996).

The Supreme Court's decision in Arthur Andersen LLP v. Carlisle, 556 U.S. 624 (2009), calls into some question the propriety of relying on a rule based on federal law in this situation. In that case, Carlisle and his associates had consulted with the accounting firm Arthur Andersen LLP about minimizing their tax liability. Id. at 626. On the basis of that consultation, Carlisle entered into management contracts with Bricolage Capital, LLC. Id. These management contracts contained arbitration clauses. Id. After the Internal Revenue Service determined that the tax strategy was illegal, Carlisle and his associates filed a diversity action against Arthur Andersen, Bricolage and others. Id. at 626-27. Claiming that equitable estoppel required Carlisle and his associates to arbitrate these claims under the agreements with Bricolage, Arthur Andersen sought a stay of the diversity action pending arbitration. Id. at 627. In the course of its decision, the Supreme Court wrote:

> Because "traditional principles" of state law
> allow a contract to be enforced by or against

> nonparties to the contract through "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel," the Sixth Circuit's holding that nonparties to a contract are categorically barred from § 3 relief was error.

Id. at 631 (emphasis added) (quoting 21 Richard A. Lord, Williston on Contracts § 57:19, at 183 (4th ed. 2001)).

Carlisle holds that, at least as a general principle, state law governs the inquiry as to whether a non-party to an arbitration agreement can assert the protection of the agreement.[26] See id. at 630-32; Lawson v. Life of the S. Ins. Co., 648 F.3d 1166, 1170-71 (11th Cir. 2011). Carlisle leaves unclear, however, whether the Court intended to disturb the uniform body of precedent in the courts of appeals, which we just have examined, holding that a uniform federal rule is required with respect to the amenability

---

[26] The text of Arthur Andersen LLP v. Carlisle, 556 U.S. 624 (2009), leaves somewhat unclear, however, whether, in determining the amenability of a non-signatory party to an arbitration clause, a court must consult general principles of state contract law or the precise law of the state whose law governs the contract. As we just have noted, the Court at one point speaks in terms of traditional principles of contract law, id. at 631, but at another, it speaks in terms of "the relevant state contract law," id. at 632. We have chosen to interpret Carlisle as requiring reference to the provisions of the applicable state law. See Awuah v. Coverall N. Am., Inc., 703 F.3d 36, 42-43 (1st Cir. 2012) (applying Massachusetts law). In this respect, we have viewed Carlisle as simply following the general proposition that in "deciding whether an agreement to arbitrate is to be enforced, we normally apply ordinary state-law principles that govern the formation of contracts, including validity, revocability, and enforceability of contracts." Bezio v. Draeger, 737 F.3d 819, 822-23 (1st Cir. 2013); see also First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

of <u>employees</u> acting within the scope of their employment to the arbitration clauses in their employers' contracts.  As we have noted earlier, the cases requiring that the employees of a company be bound by the arbitration agreements of their employers are based on the specific rationale that such a rule is necessary to protect the federal policy embodied in the FAA of favoring arbitration. Without it, according to the rationale of those cases, a party could frustrate an arbitration clause by simply naming employees as party defendants along with the signatory company in a judicial action.   Nothing  in  <u>Carlisle</u>  specifically  disapproves  the fashioning of federal law to avoid this specific abuse.  Notably, at one point in <u>Carlisle</u>, the Court seemingly limited the scope of its holding; it wrote:

> We have said many times that federal law requires that "questions of arbitrability . . . be addressed with a healthy regard for the federal policy favoring arbitration." Whatever the meaning of this vague prescription, it cannot possibly require the disregard of state law <u>permitting</u> arbitration by or against nonparties to the written arbitration agreement.

556 U.S. at 630 n.5 (quoting <u>Moses H. Cone Mem'l Hosp.</u> v. <u>Mercury Constr. Corp.</u>, 460 U.S. 1, 24–25 (1983)).  Moreover, as we have just noted, in <u>Carlisle</u>, the Court specifically noted that the state law in that case permitted arbitration and was therefore compatible with and, indeed, supportive of the federal policy embodied in the FAA.  <u>See</u> <u>id.</u>

-23-

We need not decide definitively whether <u>Carlisle</u> has abrogated this specific line of federal cases. Even if the Supreme Court's decision in <u>Carlisle</u> does signal the abrogation of the principle that, as a matter of <u>federal</u> law, the employees of a signatory of an arbitration agreement are protected by the agreement, Grand has not suggested any principle of New York law that impedes the interpretation of the agreement to protect the employee under the contract.[27] It relies solely on the text of the contract--a text that does not support the illogical and impractical vision that an employee who acts solely within the scope of her employment is not protected by her employer's arbitration clause.

## Conclusion

The district court incorrectly denied the motion by Verizon and Ms. McCahill to compel Grand to arbitrate its claims against them. Accordingly, we reverse and remand to the district court for further proceedings consistent with this opinion.

**<u>REVERSED AND REMANDED</u>**.

---

[27] As we noted earlier, before the advent of <u>Carlisle</u>, the courts of New York State had recognized, emphatically, the need for a uniform federal rule to govern whether an agent is amenable to the arbitration agreement of a principal. <u>See</u> <u>Hirschfeld Prods., Inc.</u> v. <u>Mirvish</u>, 673 N.E.2d 1232, 1233 (N.Y. 1996). There is no indication, and Grand does not suggest, that New York State would choose a different, and unique, rule to the contrary if it were to determine, in the wake of <u>Carlisle</u>, that a federal rule was no longer applicable.