# United States Court of Appeals
## For the First Circuit

No. 17-1583

DJAMEL OUADANI, on behalf of himself and all others similarly
situated,

Plaintiff, Appellee,

v.

TF FINAL MILE LLC, f/k/a Dynamex Operations East, LLC,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch and Selya, Circuit Judges,
and Levy, District Judge.*

Diane M. Saunders, with whom Ogletree, Deakins, Nash, Smoak
& Stewart, P.C. was on brief, for appellant.
Stephen Churchill, with whom Hillary Schwab, Brant Casavant,
and Fair Work, P.C. were on brief, for appellee.

November 21, 2017

---

* Of the District of Maine, sitting by designation.

**LYNCH, Circuit Judge.** Djamel Ouadani worked as a delivery driver from March to August 2016, delivering products for Dynamex Operations East, LLC ("Dynamex"), now known as TF Final Mile LLC. As a condition of his employment, Ouadani was required to associate with a vendor affiliated with Dynamex, named Selwyn and Birtha Shipping LLC ("SBS"). Ouadani received his compensation from SBS, which had a written contract with Dynamex. Ouadani did not have a written contract either with Dynamex or with SBS.

In August 2016, Ouadani complained to Dynamex that he lacked the independence of a contractor, and that he should be paid as an employee if Dynamex continued to exert the same degree of control over his work. He was terminated shortly after he complained.

After his termination, Ouadani brought various wage-and-hour claims against Dynamex in federal district court, styling his action as a putative class action on his behalf and on behalf of others similarly situated. Dynamex responded by filing a motion to compel arbitration, pointing to an agreement between Dynamex and SBS that contained a mandatory arbitration clause.

The district court denied Dynamex's motion, reasoning that Ouadani had never signed the agreement containing the arbitration clause and had no idea that the agreement even existed. Ouadani v. Dynamex Operations E., LLC, No. 16-12036, 2017 WL 1948522, at *3-5 (D. Mass. May 10, 2017). On appeal, Dynamex

argues that Ouadani should nonetheless be compelled to arbitrate under federal common law principles of contract and agency. Because these arguments are without merit, we affirm.

## I. **Background**

A.    **Facts**[1]

In early 2016, Ouadani applied to Dynamex for a job as a delivery driver, transporting products ordered through Google Express. After contacting Dynamex, Ouadani was invited to a meeting at the Dynamex offices in Wilmington, Massachusetts. At the meeting, Dynamex employees interviewed Ouadani and asked him to complete a number of forms, including one indicating his available days and hours. Dynamex also gave Ouadani a Dynamex shirt, albeit one that he had to pay for; took his photograph for a Dynamex identification badge; told him that he needed to pass a drug test; and provided him with information about the services the company provided for Google Express. Dynamex told Ouadani

---

[1]    The facts in this section are drawn from Ouadani's complaint, exhibits to the complaint, and the Independent Contractor Agreement between Dynamex and SBS. We accept these facts, which Dynamex does not dispute for purposes of evaluating its motion to compel arbitration, as true for purposes of this appeal. We do not and need not reach the issue of whose employee or independent contractor Ouadani was. This decision also does not concern the separate issue of whether the arbitration agreement between Dynamex and SBS is enforceable.

that he would be paid eighteen dollars per hour, or seventy-two dollars for a four-hour shift.

During the meeting at the Dynamex offices in Wilmington, Dynamex also gave Ouadani the names and telephone numbers of three Dynamex-affiliated vendors and told Ouadani that he would have to "associate" with one of them.  For aught that appears, the term "associate" was never defined.  Ouadani decided to associate with SBS.  SBS was owned and managed by another Dynamex delivery driver, Edward Alwis, whom Ouadani had never met.  Neither SBS nor Dynamex classified Ouadani as an employee.

Unbeknownst to Ouadani, Dynamex and SBS had entered into an "Independent Contractor Agreement for Transportation Services" (the "Agreement") in January 2016, pursuant to which SBS agreed to perform delivery services "brokered or subcontracted by Dynamex" (the "Contracted Services").  SBS was permitted to hire employees or subcontractors to perform some or all of the Contracted Services.  The Agreement included the following arbitration provision:

> In the event of a dispute between the parties, the parties agree to resolve the dispute as described in this Section (hereafter "the Arbitration Provision").  This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1, et seq., and applies to any dispute brought by either [SBS] or Dynamex arising out of or related to this Agreement, [SBS's] relationship with Dynamex (including termination of the relationship), or the service arrangement contemplated by

- 4 -

this Agreement, including cargo claims and payment disputes, but excluding all claims that may be adjudicated in small claims court. The provisions of this Arbitration Provision shall remain in force after the parties' contractual relationship ends. BY AGREEING TO ARBITRATE ALL SUCH DISPUTES, THE PARTIES TO THIS AGREEMENT AGREE THAT ALL SUCH DISPUTES WILL BE RESOLVED THROUGH BINDING ARBITRATION BEORE AN ARBITRATOR AND NOT BY WAY OF A COURT OR JURY TRIAL.

In a subsection entitled "Claims Covered By Arbitration Provision," the Agreement stated that "[u]nless carved out below, claims involving the following disputes shall be subject to arbitration under this Arbitration Provision regardless of whether brought by Contractor, Dynamex or any agent acting on behalf of either . . . ." The arbitration provision expressly extended to "disputes regarding any city, county, state or federal wage-hour law."

The Agreement also contained a provision that required SBS's subcontractors to "satisfy and comply with all the terms of th[e] Agreement" and required SBS to provide Dynamex with a written agreement from any subcontractor that SBS utilized attesting that the subcontractor had agreed to comply with the terms of the Agreement. SBS did not have Ouadani execute such a written agreement.

After passing his drug test, shadowing another delivery driver for a couple of days, receiving his Dynamex identification badge, and obtaining a cell phone and scanner set up with Google

- 5 -

Express's software, Ouadani began working as a delivery driver for Dynamex. Dynamex required Ouadani to wear a Dynamex-issued shirt, which was marked by a large Dynamex logo, and his Dynamex identification badge when he delivered products for Dynamex. Ouadani used a Dynamex-issued e-mail address to receive communications and directions from Dynamex managers. Dynamex provided Ouadani with his assigned shifts for each week, and gave Ouadani specific instructions about his delivery schedules, including delivery locations, the order of deliveries, and delivery timeframes.

For each four-hour shift worked by Ouadani, Dynamex paid SBS seventy-two dollars, from which Dynamex subtracted, as to Ouadani, amounts related to insurance, use of cell phones and scanners, technology charges, failure to work assigned shifts, late log-ins, and damaged or stolen products. In addition to these amounts, SBS deducted, as to Ouadani, 17.5 percent of the net payment it received from Dynamex to pay for workers' compensation, other insurance, and payroll expenses. SBS then provided the remaining funds to Ouadani. To perform his duties, Ouadani used his own car and paid for his own gas without reimbursement. Ouadani calculates that, after mileage costs and the various

deductions by Dynamex and SBS, his net pay for a four-hour shift ranged from $1.35 to $8.10 per hour.

In August 2016, Ouadani complained to Dynamex that he was not given the independence of a contractor, and that he would need to be paid as an employee if Dynamex continued to exercise the same degree of control over his work. Shortly after receiving Ouadani's complaint, Dynamex permanently removed him from the driver schedule, thereby effecting the termination of his employment.

B.    District Court Proceedings

On October 11, 2016, Ouadani filed a putative class action complaint against Dynamex, asserting that Dynamex misclassified him and other delivery drivers as independent contractors in violation of state and federal wage-and-hour laws. The complaint also alleged that the misclassification had unjustly enriched Dynamex, and that Dynamex had improperly retaliated against Ouadani in violation of Mass. Gen. L. ch. 149, § 148A. Ouadani sought to recover unpaid wages, reimbursement of improper deductions and unpaid travel expenses, and damages resulting from Dynamex's retaliation.

On February 9, 2017, Dynamex filed a motion to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. Ouadani opposed the motion. On May 10, 2017, the

court entered a memorandum and order denying Dynamex's motion. Dynamex timely appealed the order.

## II. <u>Analysis</u>

We review de novo a district court's interpretation of an arbitration agreement and its decision regarding whether or not to compel arbitration. <u>S. Bay Bos. Mgmt.</u> v. <u>Unite Here, Local 26</u>, 587 F.3d 35, 42 (1st Cir. 2009).

The FAA provides that written arbitration agreements concerning transactions in interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; <u>see</u> <u>also</u> <u>Circuit City Stores, Inc.</u> v. <u>Adams</u>, 532 U.S. 105, 111-12 (2001). The FAA embodies a "liberal federal policy favoring arbitration." <u>Moses H. Cone Mem'l Hosp.</u> v. <u>Mercury Constr. Corp.</u>, 460 U.S. 1, 24 (1983). That policy requires "ambiguities as to the scope of the arbitration clause itself [to be] resolved in favor of arbitration." <u>Volt Info. Scis., Inc.</u> v. <u>Bd. of Trs. of Leland Stanford Junior Univ.</u>, 489 U.S. 468, 476 (1989).

On the other hand, a "basic precept" underlying the FAA is that "arbitration is a matter of consent, not coercion." <u>Stolt-Nielsen S.A.</u> v. <u>AnimalFeeds Int'l Corp.</u>, 559 U.S. 662, 681 (2010) (quoting <u>Volt Info. Scis.</u>, 489 U.S. at 479). As such, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." <u>AT&T Techs., Inc.</u> v. <u>Commc'ns</u>

Workers of Am., 475 U.S. 643, 648 (1986) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)). It is undisputed that Ouadani never signed the Agreement containing the arbitration clause at issue, or even knew about it. A party that seeks to compel arbitration "must show [1] that a valid agreement to arbitrate exists, [2] that the movant is entitled to invoke the arbitration clause, [3] that the other party is bound by that clause, and [4] that the claim asserted comes within the clause's scope." InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003). The pertinent question on appeal concerns the third prong: is Ouadani, a nonsignatory to the Agreement, bound to arbitrate his claims against Dynamex?

To answer that question, we look to federal common law, which incorporates "general principles of contract and agency law." Id. at 144. Examples of such principles include incorporation by reference, assumption, agency, alter ego, estoppel, and third-party beneficiary. See id. at 146-50, Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995). The theories asserted by Dynamex on appeal include (1) that Ouadani is bound to arbitrate inasmuch as he is an "agent" of SBS, (2) that Ouadani should be equitably estopped from refusing

- 9 -

to arbitrate, and (3) that Ouadani is bound by the arbitration clause because he is a third-party beneficiary of the Agreement.

A.   Agency

Dynamex asserts that Ouadani should be bound to arbitrate because he is an "agent" of SBS. We disagree. Dynamex notes that the arbitration clause in the Agreement reaches disputes "brought by [SBS], Dynamex or any agent acting on behalf of either." (emphasis added). But Ouadani is not, in this context, bringing his wage-and-hour claims as an "agent acting on behalf" of SBS. To the contrary, Ouadani is bringing his claims against Dynamex on his own behalf and purportedly on behalf of other similarly situated drivers. The alleged agency relationship between Ouadani and SBS is irrelevant to the "legal obligation in dispute." See InterGen, 344 F.3d at 148 (refusing to compel arbitration against a parent corporation which was not a signatory to an arbitration agreement, even though its subsidiary was a signatory and acted as the parent's agent in certain other contexts, because there was no evidence that the subsidiary acted as the parent's agent when it committed the specific acts that were the subject of the dispute).

Cases from other circuits which have found an agent to be subject to a principal's arbitration agreement are distinguishable. Those cases held that nonsignatory defendants who are agents of a signatory corporation may compel arbitration

against signatory plaintiffs.  See Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 10-11 (1st Cir. 2014) (holding that a nonsignatory employee of a signatory corporation may compel arbitration against signatory plaintiffs); Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1121-22 (3d Cir. 1993) (holding that a nonsignatory employee and a nonsignatory corporate sister of a signatory corporation may compel arbitration against signatory plaintiffs); Arnold v. Arnold Corp.-Printed Commc'ns For Bus., 920 F.2d 1269, 1281-82 (6th Cir. 1990) (holding that nonsignatory officers and directors of a signatory corporation are entitled to compel arbitration against signatory plaintiffs); Letizia v. Prudential Bache Sec., Inc., 802 F.2d 1185, 1187-88 (9th Cir. 1986) (holding that nonsignatory employees of a signatory broker are entitled to compel arbitration against signatory plaintiffs).  These holdings were predicated on (1) the fact that the claims of the signatory plaintiffs arose from the nonsignatory agents' conduct on behalf of the signatory principals, and (2) the signatory principals' intent to protect their agents by means of the arbitration provisions.  See Grand Wireless, 748 F.3d at 10-11; Pritzker, 7 F.3d at 1122; Arnold, 920 F.2d at 1282; Letizia, 802 F.2d at 1188.  These rationales are inapposite here because Ouadani is a nonsignatory plaintiff who is

trying to <u>avoid</u> arbitration, not a nonsignatory <u>defendant</u> seeking to <u>compel</u> it.

B.    <u>Equitable Estoppel</u>

Equitable estoppel "precludes a party from enjoying rights and benefits under a contract while at the same time avoiding its burdens and obligations." <u>InterGen</u>, 344 F.3d at 145. Federal courts generally "have been willing to estop a <u>signatory</u> from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." <u>Id.</u> (quoting <u>Thomson-CSF</u>, 64 F.3d at 779). But courts have been reluctant to estop a nonsignatory attempting to avoid arbitration. <u>Id.</u> at 145-46. In the latter scenario, "estoppel has been limited to 'cases [that] involve non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract.'" <u>Id.</u> at 146 (quoting <u>E.I. DuPont de Nemours & Co.</u> v. <u>Rhone Poulenc Fiber & Resin Intermediates, S.A.S.</u>, 269 F.3d 187, 200 (3d Cir. 2001)).

Dynamex claims that Ouadani knowingly sought and obtained benefits from the Agreement because he performed the "Contracted Services" pursuant to the Agreement for compensation. It also argues that the Agreement would be "useless" without drivers like Ouadani to perform the contemplated services. These

arguments are unpersuasive because the benefits of the arbitration clause of the Agreement accrue to the contracting signatories -- Dynamex and SBS -- not to Ouadani.  Ouadani can hardly be said to have "embraced" the Agreement when he was unaware of its existence.

Dynamex presses another, similar argument: Ouadani "knowingly exploit[ed]" the Agreement by asserting claims that can only be determined by reference to the Agreement.  In particular, Dynamex argues that Ouadani's claims "are premised on his position that he performed the 'Contracted Services'" on behalf of SBS, and that "such a relationship could only exist through the Agreement" because Ouadani acknowledges that "he associated with [SBS] and was paid directly by [SBS]."

To support this argument, Dynamex cites two distinguishable California cases concerning an arbitration clause involving SuperShuttle International ("SuperShuttle"), a provider of door-to-door airport shuttling services.  Dynamex first cites Kairy v. Supershuttle International Inc., No. 08-CV-02993, 2012 WL 4343220 (N.D. Cal. Sept. 20, 2012), a case in which former SuperShuttle franchisees who drove for SuperShuttle, as well as nonsignatory secondary drivers who drove for SuperShuttle pursuant to a relationship with the franchisees, brought wage-and-hour claims against SuperShuttle.  Id. at *1, *9.  There, the district court compelled arbitration against the secondary drivers, even though they were not signatories to the relevant franchise

- 13 -

agreements, because they "knowingly exploited the rights and privileges granted under the [franchise] agreements" by "participat[ing] actively and for compensation in the rights and duties described in the [franchise agreements]." Id. at *9. Notably, the secondary drivers' federal and state labor law claims required the drivers to "specifically perform[] under the [franchise agreements]." Id.

Dynamex also cites Supershuttle International, Inc. v. Aysov, Nos. CIV 535204-08, 2015 WL 10388413 (Cal. Super. Dec. 23, 2015). In that case, a California state trial court compelled arbitration against nonsignatory SuperShuttle drivers because they were found to have received financial benefits from the franchise agreement, which provided the only basis for their assertion of state labor law claims against SuperShuttle. Id. at *2.

These cases are distinguishable. Unlike the secondary SuperShuttle drivers, Ouadani did not "knowingly exploit[]" or "participate actively and for compensation," Kairy, 2012 WL 4343220, at *9, in the rights described in the Agreement -- he did not even know that the Agreement existed. And the Agreement does

not provide the only basis for Ouadani's claims, which stem from his arrangement with Dynamex.[2]

C.    Third-Party Beneficiary

The third-party beneficiary doctrine, while similar in some ways to estoppel, is a distinct ground for compelling a nonsignatory to arbitrate.  While a court considering the application of equitable estoppel includes a focus on the parties' conduct after the execution of the contract, a court analyzing whether the third-party beneficiary doctrine applies looks to the parties' intentions at the time the contract was executed.  See Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 345 F.3d 347, 362 (5th Cir. 2003) (quoting DuPont, 269 F.3d at 200 n.7).  The "critical fact" that determines whether a nonsignatory is a third-party beneficiary is whether the underlying agreement "manifest[s] an intent to confer specific legal rights upon [the nonsignatory]."

_____

[2]    Dynamex also cites Fluehmann v. Associates Financial Services, No. Civ.A. 01-40076, 2002 WL 500564 (D. Mass. Mar. 29, 2002), to support his estoppel argument.  That case can be distinguished for similar reasons.  The district court in Fluehmann compelled arbitration, under an estoppel theory, against a plaintiff who had cosigned a mortgage deed with her husband but had not signed the accompanying loan agreement or the arbitration agreement that was incorporated into the loan agreement.  Id. at *1-2.  The court held that the plaintiff could not "have it both ways" -- because her cause of action arose from the interdependence of the loan agreement and the mortgage deed, she could not reap the benefit of bringing a suit dependent on the loan agreement without being subject to the accompanying burden of binding arbitration.  Id. at *7.  Here, Ouadani's claims against Dynamex do not require him to embrace the Agreement.

InterGen, 344 F.3d at 147 (emphasis added).  Here, the language of the Agreement does not manifest any such intent.

In InterGen, we noted that the third-party beneficiary theory should be approached "with care" because the law "requires 'special clarity' to support a finding 'that the contracting parties intended to confer a benefit' on a third party."  Id. at 146 (quoting McCarthy v. Azure, 22 F.3d 351, 362 (1st Cir. 1994)). As such, a mere benefit to the nonsignatory resulting from a signatory's exercise of its contractual rights is not enough.  Id. at 146-47.

Dynamex fails to identify any language in the Agreement that can be read to provide Ouadani with "specific legal rights." InterGen, 344 F.3d at 147.  Dynamex points to the provision of the Agreement stating that SBS's subcontractors "must satisfy and comply with all the terms of th[e] Agreement" and requiring SBS to provide Dynamex, at Dynamex's request, with a "written agreement" from any subcontractor it chooses to utilize attesting that the subcontractor has agreed to comply with the terms of the Agreement. Even assuming, arguendo, that Ouadani is a subcontractor of SBS, Dynamex's reliance on this provision is misplaced.  The provision describes SBS's obligations to Dynamex.  It does not say that SBS's subcontracted drivers are third-party beneficiaries of the Agreement.  Moreover, to the extent that the provision evinces an intent to bind subcontractors to the Agreement's terms, it

- 16 -

contemplates a specific mechanism for doing so: SBS must obtain from the subcontractor a "written agreement" to comply with the Agreement's terms, and provide the written agreement to Dynamex. Dynamex's and SBS's failure to obtain a written agreement from Ouadani cuts against Dynamex's argument that Ouadani should be bound by the Agreement.

Dynamex attempts to escape this conclusion by citing the SuperShuttle cases. In Kairy, the district court found that the nonsignatory drivers were intended third-party beneficiaries of the franchise agreements by virtue of the agreements' express language, which "contemplated and permitted that the franchisees could hire secondary drivers," and thus gave the secondary drivers "the right to enforce the agreements." 2012 WL 4343220, at *9. And in Aysov, the state trial court found the nonsignatory drivers to be intended third-party beneficiaries because the drivers would never have been hired in the absence of the franchise agreement. 2015 WL 10388413, at *1.

The SuperShuttle cases are inapposite because they concern drivers who were hired by intermediary franchisees rather than SuperShuttle itself. Here, Dynamex -- not SBS, the intermediary -- screened, hired, supervised, and determined the compensation of its drivers. Ouadani's mandated association with SBS for payment purposes does not alter the fact that Dynamex ultimately controlled the terms and conditions of Ouadani's work

- 17 -

as a delivery driver.  Ouadani's claims do not depend on the existence of a right guaranteed in the Agreement between Dynamex and SBS; they are grounded in Ouadani's relationship with Dynamex.

In short, Dynamex's failure to show that the parties to the Agreement intended to provide any legal rights to Ouadani is fatal to its third-party beneficiary claim.

### III. Conclusion

We affirm the decision of the district court.  Dynamex is ordered to show cause by written response within fifteen days as to why the court should not assess double costs for "needlessly consuming the time of the court and opposing counsel."  D'Angelo v. N.H. Supreme Court, 740 F.3d 802, 808 (1st Cir. 2014) (citing In re Simply Media, Inc., 566 F.3d 234, 236 (1st Cir. 2009)); see also Fed. R. App. P. 38; 1st Cir. R. 38.0.