# United States Court of Appeals
## For the First Circuit

No. 24-1248

KAREN MORALES-POSADA, individually and on behalf of all others
similarly situated, AMANDA SARMENTO, individually and on behalf
of all others similarly situated, FERREIRA GUIMARAES,
individually and on behalf of all others similarly situated,
WILLIANA ROCHA, individually and on behalf of all others
similarly situated, SARA BARRIENTOS, individually and on behalf
of all others similarly situated

Plaintiffs, Appellees,

v.

CULTURAL CARE, INC.,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

---

Before

Barron, Chief Judge,
Howard and Gelpí, Circuit Judges.

---

Alex H. Loomis, with whom William B. Adams, Harvey J. Wolkoff,
Aliki Sofis, Alexander S. del Nido, and Quinn Emanuel Urquhart &
Sullivan, LLP, were on brief, for appellant.
David H. Seligman, with whom Towards Justice, Peter Rukin,
Rukin, Hyland & Riggin LLP, Matthew C. Helland, and Nichols Kaster,
LLP, were on brief, for appellees.

June 18, 2025

**BARRON, Chief Judge**.  May a party who is <u>not</u> a signatory to a contract invoke its arbitration provisions to compel the arbitration of claims brought by a party who <u>is</u>?  We conclude that the answer in this case is no.  We thus affirm the denial of the motion to compel arbitration that is at issue in this appeal.

## I.

The parties have already been before us once on appeal.  See <u>Morales Posada</u> v. <u>Cultural Care, Inc.</u>, 66 F.4th 348 (1st Cir. 2023).  We therefore recite the travel of the case only briefly.

Cultural Care, Inc. is a Massachusetts company that places foreign nationals as au pairs with host families throughout the United States.  It is a designated "sponsor" of the U.S. Department of State's au pair exchange program.  See <u>ASSE Int'l, Inc.</u> v. <u>Kerry</u>, 803 F.3d 1059, 1064 (9th Cir. 2015); 22 C.F.R. § 62.31.

The four named plaintiffs are foreign nationals who participated in the au pair program as au pairs.  They filed the operative complaint -- which is the Second Amended Complaint -- in February 2021.  They did so in the United States District Court for the District of Massachusetts on behalf of themselves and others in their asserted class, all of whom are also foreign nationals who participated in the au pair program as au pairs.

The complaint alleges that Cultural Care violated the plaintiffs' rights under the Fair Labor Standards Act (FLSA) and

various state wage and hour laws by failing to pay them legal wages for their work as au pairs. It also alleges violations of state deceptive trade practices laws.

Cultural Care moved to dismiss the complaint. The grounds included that Cultural Care was entitled to derivative sovereign immunity under Yearsley v. W.A. Ross Construction Company, 309 U.S. 18 (1940), due to its status as a State Department-designated sponsor of the au pair exchange program. The District Court denied in part the motion to dismiss, including the asserted Yearsley defense.

Cultural Care filed an interlocutory appeal. It cited the collateral order doctrine as the basis for our exercising appellate jurisdiction to review the denial of its motion to dismiss with respect to the Yearsley issue. Morales Posada, 66 F.4th at 350. It also urged us to exercise pendent appellate jurisdiction over the other grounds it had set forth for dismissing the plaintiffs' claims. Id.

After hearing oral argument and soliciting the views of the State Department as amicus curiae, we affirmed the District Court's denial in part of Cultural Care's motion to dismiss. Id. at 364. We reasoned that Cultural Care had not established that it was entitled to protection under Yearsley at that stage of the litigation. Id. at 363. We also declined to exercise pendent

- 4 -

appellate jurisdiction over the remainder of the appeal.  Id. at 364.

After mandate issued and the case returned to the District Court, Cultural Care filed its answer to the plaintiffs' operative complaint on July 7, 2023.  It asserted as one of its defenses that the plaintiffs' "claims and purported class action are barred by their arbitration agreements."  Thereafter, on August 18, 2023, Cultural Care filed a motion to compel arbitration of the plaintiffs' claims pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), art. II, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3; see also 9 U.S.C §§ 201-208 (implementing the New York Convention).

The parties stipulated to and conducted limited discovery.  The plaintiffs opposed Cultural Care's motion to compel arbitration on various grounds.  On February 28, 2024, the District Court denied the motion.

Cultural Care premised the motion first on a contract that it asserted all au pairs had signed with it beginning in January 2023 ("2023 Contract") and which contained an agreement to arbitrate any disputes.  The District Court denied Cultural Care's motion without prejudice insofar as it rested on this contract.

The District Court explained that Cultural Care had produced no evidence that the contract bound any of the named plaintiffs, all of whom began their employment well prior to 2023. It also noted that Cultural Care had not identified any opt-in plaintiff who had signed the 2023 Contract. Cultural Care has not appealed this decision.

Cultural Care independently premised its motion on a separate contract that all au pairs selected for sponsorship between January 2018 and December 2022 -- including the named plaintiffs[1] -- had assertedly signed with a company called International Care Ltd. (ICL). ICL is a Swiss company that is "separate and distinct" from Cultural Care and that "provided . . . recruiting, screening, and other pre-departure services" in connection with the au pair program.[2] We will refer

---

[1] In the District Court proceedings, the plaintiffs disputed whether Cultural Care had met its burden to show that the named plaintiffs each signed the ICL contract. The District Court "assume[d]," for the purposes of resolving Cultural Care's motion, that Cultural Care had met this burden, because the plaintiffs had "not offered any contrary evidence or evidence that th[e] [signed contracts Cultural Care produced were] not authentic." We need not address this issue because we affirm on the grounds relied on by the District Court.

[2] Because ICL also uses "Cultural Care" as its registered business name, the ICL Contract refers collectively to ICL and its "successors and assignees" as "CC." No party contends, however, that any of the references to "CC" or to "Cultural Care" in the ICL Contract are to Cultural Care, Inc., the Massachusetts company that is a party to this case, rather than to ICL, the distinct Swiss company that is a signatory to the contract. For clarity, we refer to ICL only by its legal name, ICL.

to this contract, which figures prominently in this appeal, as the ICL Contract.

The ICL Contract sets forth various terms and conditions of the au pairs' participation in the au pair program. It also includes a provision setting forth an agreement to arbitrate disputes that Cultural Care argues it is entitled to enforce in this case. That provision states:

> In the event of any claim, dispute, or proceeding arising out of the relationship of me and [ICL], or any claim which in contract, tort, or otherwise at law or in equity arises between the parties, whether or not related to this Agreement, the parties submit and consent to the exclusive jurisdiction and venue of the arbitrational tribunals of Switzerland.

The District Court determined that Cultural Care could not compel arbitration in reliance on this agreement. It did so on two separate grounds.

First, the District Court concluded that Cultural Care had waived any right to compel arbitration because it had "'substantially invoked' the litigation machinery in this case" (quoting FPE Found. v. Cohen, 801 F.3d 25, 29 (1st Cir. 2015)). The District Court emphasized that Cultural Care had "fully litigated" a motion to dismiss that reached the merits of the plaintiffs' claims and that it had even obtained interlocutory review of that motion, "appeal[ing] to the First Circuit to address not only the immunity question but also [its] 12(b)(6) arguments,"

- 7 -

all the while making no mention of arbitration. The District Court also pointed to Cultural Care's opposition to conditional class certification and to its motion to strike the consents to sue as further evidence of its "'substantial[] invo[cation]' [of] the litigation machinery in this case" (quoting Cohen, 801 F.3d at 29).

Second, the District Court concluded that, even if Cultural Care had not waived its right to compel arbitration, it still could not enforce the ICL Contract's arbitration agreement. It rejected Cultural Care's contention that the ICL Contract contained an agreement delegating questions concerning arbitrability to the arbitrator to decide. It then held that, as a nonsignatory to the ICL Contract, Cultural Care could not enforce the arbitration agreement in that contract under either of the theories that Cultural Care advanced, which were premised, respectively, on its claimed third-party-beneficiary status and the doctrine of equitable estoppel.

The District Court concluded that Cultural Care could not enforce the arbitration agreement as a third-party beneficiary because the contract did not demonstrate with "special clarity" that the contracting parties intended for Cultural Care to benefit from the arbitration agreement. See Hogan v. SPAR Grp., Inc., 914 F.3d 34, 39 (1st Cir. 2019) (quoting McCarthy v. Azure, 22 F.3d 351, 362 (1st Cir. 1994)). It separately concluded that Cultural

Care could not enforce the arbitration agreement based on the doctrine of equitable estoppel because, contrary to Cultural Care's assertions, none of the plaintiffs' claims depended on anything contained in the ICL Contract.

Cultural Care timely appealed.

## II.

We review de novo a district court's order resolving a party's motion to compel arbitration.  Barbosa v. Midland Credit Mgmt., Inc., 981 F.3d 82, 86 (1st Cir. 2020).  Predicate questions of fact are subject to clear error review.  Menorah Ins. Co. v. INX Reinsurance Corp., 72 F.3d 218, 220 (1st Cir. 1995).

The parties dispute what law applies to the questions at issue in this appeal.  Cultural Care contends that it is the "law of the contract -- here, Swiss law -- [that] determines whether [the] claims are arbitrable" (citation omitted).  The plaintiffs argue that "Cultural Care must establish that it has the authority to compel arbitration as a nonsignatory under both federal common law and Swiss law."

We need not resolve this question. Cultural Care contends that "there is . . . no relevant difference between Swiss law and federal common law," and we conclude that Cultural Care cannot prevail under the latter.  See OneBeacon Ins. Co. v. Georgia-Pac. Corp., 474 F.3d 6, 9 (1st Cir. 2007) ("bypass[ing]" choice-of-law questions as there was no "significant difference in

- 9 -

the laws of the relevant states"); see also Sourcing Unlimited, Inc. v. Asimco Int'l, Inc., 526 F.3d 38, 46 (1st Cir. 2008) ("In the absence of any contention from the parties to the contrary, we apply federal common law to resolve the issue[] [of nonsignatory enforcement of an arbitration clause]."); InterGen N.V. v. Grina, 344 F.3d 134, 143 (1st Cir. 2003) (applying federal common law under the New York Convention).  Nor, as we will explain, do any of Cultural Care's arguments on appeal pertaining to Swiss law require a different result.

**III.**

Cultural Care challenges the District Court's denial of its motion to compel arbitration on various grounds.[3]  Many of them pertain to the ICL Contract.  Before advancing these ICL-contract-related arguments, however, Cultural Care devotes several paragraphs of its opening brief to addressing the application of the New York Convention to this case.  We thus start with Cultural Care's discussion of that treaty.

Article II of the New York Convention addresses the recognition and enforcement of international arbitration

---

[3] Because we conclude, for the reasons discussed below, that Cultural Care has not shown that it is entitled to enforce the arbitration agreement as a nonsignatory, we need not reach the District Court's alternative conclusion that Cultural Care waived any arbitration rights it might have had through its litigation conduct.  For the same reason, we need not address the plaintiffs' contention that the ICL Contract is unenforceable as a matter of public policy.

agreements. As we have previously explained, the "command to courts [contained in Article II] to enforce [such] arbitration agreements is self-executing." Green Enters., LLC v. Hiscox Syndicates Ltd., 68 F.4th 662, 672 (1st Cir. 2023). Congress has also partially implemented Article II through its enactment of Chapter 2 of the FAA. See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC, 590 U.S. 432, 438-39 (2020).

Cultural Care argues that the arbitration agreement that it seeks to enforce is covered by Article II. It further contends that, under what it terms the "very limited" inquiry that the Convention permits, the District Court had "no . . . discretion" to deny its motion.

The Supreme Court of the United States in GE Energy explained that the New York Convention does not prohibit contracting states from applying "more generous" doctrines regarding nonsignatory enforcement under domestic law -- there, the FAA. Id. at 440. But, notably, GE Energy did not appear to definitively resolve how Article II itself applies in such circumstances, given that, by its terms, the Convention is "silent on the issue of nonsignatory enforcement." Id. at 439-440, 445.

We see no need to determine whether and to what extent the Convention governs in this case. The plaintiffs do not appear to dispute Cultural Care's premise that the New York Convention applies. In addition, Cultural Care at no point contends that any

- 11 -

of its arguments on appeal turn on the application of law specific to the New York Convention -- as opposed to the FAA. Thus, Cultural Care does not contend that its position would prevail in a New York Convention case even if it would fail under more general principles of federal arbitration law.

Accordingly, we assume (favorably to Cultural Care) that the New York Convention does apply. We therefore move on to address Cultural Care's arguments as to why, given the arbitration provisions in the ICL Contract, the District Court was obligated to grant its motion to compel arbitration of the plaintiffs' claims.

**IV.**

Cultural Care contends that the District Court erred in denying its motion to compel arbitration in part because the District Court wrongly ruled under applicable federal and Swiss law that it was not entitled to invoke the arbitration agreement in the ICL Contract as a third-party beneficiary. But Cultural Care also advances an antecedent argument. It contends that the District Court wrongly rejected its argument that the determination of whether Cultural Care can compel arbitration of the plaintiffs' claims must itself be decided by an arbitrator because the ICL Contract contains an agreement to delegate to the arbitral tribunal disputes over arbitrability. We begin with this contention.

**A.**

As a threshold matter, the parties dispute whether the language that Cultural Care points to in the ICL Contract constitutes an agreement to delegate disputes over arbitrability to an arbitrator. But we need not resolve that dispute. The plaintiffs correctly point out that even if that language does constitute a delegation provision, Cultural Care "would still need to establish its right to enforce the delegation provision as a nonsignatory" to the ICL Contract. And, as we will next explain, we agree with the plaintiffs that Cultural Care has not done so.

"A delegation clause is merely a specialized type of arbitration agreement." New Prime, Inc. v. Oliveira, 586 U.S. 105, 112 (2019). Through it, parties "agree to allow the arbitrator to decide both whether a particular dispute is arbitrable as well as the merits of the dispute." Apollo Computer, Inc. v. Berg, 886 F.2d 469, 473 (1st Cir. 1989). When a contract contains a "clear and unmistakable" delegation by the parties of the question of arbitrability, "the courts must respect the parties' decision as embodied in the contract," and leave to the arbitrator to decide whether "the arbitration agreement applies to [the] particular dispute" between them. Bossé v. New York Life Ins., 992 F.3d 20, 27-28 (1st Cir. 2021) (quoting Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 65, 68 (2019)); see also Awuah v. Coverall N. Am., Inc., 554 F.3d 7, 11 (1st Cir.

- 13 -

2009) ("[T]he validity of an arbitration clause is itself a matter for the arbitrator where the agreement so provides.").

Cultural Care appears to be contending that we must enforce the claimed delegation agreement in the ICL Contract as we would enforce a delegation agreement in an ordinary case involving both of the parties to the contract containing that agreement. But the ICL Contract embodies no decision reached between the only parties to this suit -- Cultural Care and the plaintiffs. Thus, Cultural Care's request that we enforce the delegation agreement in the ICL Contract is not a request that we "respect the parties' decision as embodied in the contract." Bossé, 992 F.3d at 27 (emphasis added) (quoting Henry Schein, 586 U.S. at 65).

Indeed, as a general rule, contractual agreements bind only the parties to the agreement and may be enforced only by those parties. McCarthy, 22 F.3d at 362; see also Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 9 (1st Cir. 2014) ("[A]s a general proposition, a contract cannot bind a non-party."). This rule holds absent a showing that "traditional principles" of contract law permit nonsignatory enforcement in a given case. See Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009) (listing as such "traditional principles" "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel" (quoting 21 Williston on Contracts § 57:19 (4th ed. 2001))). So, in light of "the

- 14 -

general rule that a contract does not grant enforceable rights to nonsignatories," McCarthy, 22 F.3d at 362, Cultural Care may invoke the asserted delegation clause -- which it devotes many pages to showing the ICL Contract contains -- only if it can explain how this general rule is overcome in this case. Yet, Cultural Care offers no such explanation.

To be sure, Cultural Care does invoke our decision in Apollo Computer, Inc. v. Berg, 886 F.2d 469. But that precedent does not aid its cause.

We concluded there that the defendants -- who were not signatories to the contract, but who were assigned a signatory's contractual rights -- could compel arbitration under the contract's delegation clause. Id. at 473. We reasoned that the arbitration agreement delegated to the arbitrator "decisions about the arbitrability of disputes" so long as a "prima facie agreement to arbitrate" existed. Id. Following the parties' lead, we drew that "prima facie" standard from the arbitral rules incorporated into that contract. Id. And we further concluded that the defendants had made such a prima facie showing because they had been assigned a signatory's rights under the contract, including the right to compel arbitration. Id.; see also id. at 470 (explaining that a bankruptcy trustee had "assigned Dico's right to bring claims for damages against Apollo to the defendants").

We did not hold in <u>Berg</u>, however, that a party to a lawsuit may force its opponent to arbitrate threshold issues regarding the arbitrability of their dispute so long as that party's opponent is a signatory to some arbitration agreement containing a delegation provision. We did acknowledge in <u>Berg</u> that there was some dispute as to whether the "right [to compel arbitration] was validly assigned to the defendants." <u>Id.</u> at 473. But we then went on to conclude that, given the prima facie evidence that an assignment had in fact occurred, the question of whether the agreement to arbitrate remained valid in light of the assignment was one for the arbitrator to decide. <u>Id.</u> Accordingly, we rejected the plaintiff's argument that we should decline to compel arbitration because no "agreement to arbitrate exist[ed] <u>between it and the defendants</u>." <u>Id.</u> (emphasis added).

In addition, we did not reject this argument because the existence of an agreement between the parties <u>to the suit</u> was irrelevant to the question of delegation. We rejected this argument because we agreed with the defendants that they had made a prima facie showing that the contract containing the arbitration agreement had been assigned to them and thus that they had been assigned the right to enforce that agreement. <u>Id.</u>

Cultural Care's references to <u>Awuah</u> v. <u>Coverall North America, Inc.</u>, 554 F.3d 7, and <u>Bossé</u> v. <u>New York Life Insurance</u>, 992 F.3d 20, also are of no help to it. Both <u>Awuah</u> and <u>Bossé</u>

- 16 -

involved contracts executed between the parties to the suit. Thus, neither one addresses the issue of nonsignatory enforcement of a delegation clause.

Cultural Care does argue, as we will soon see, that it is entitled to enforce the arbitration agreement in the ICL Contract as a third-party beneficiary. But Cultural Care does not advance any contention that it enjoys that status with respect to the claimed delegation agreement itself. It also develops no argument that the kind of prima facie showing that Berg deemed sufficient to permit the nonsignatory in that case to enforce the delegation provision at issue would be sufficient here. Nor has it developed any argument that it has made such a showing by virtue of the arguments that it advances regarding the arbitration agreement itself. And Cultural Care fails to do so even though the language in the ICL Contract that it contends constitutes the delegation agreement hardly of its own force suggests that Cultural Care may enforce that agreement (even assuming, that is, that the ICL Contract includes an agreement to delegate at all).

As a result, Cultural Care has not made "the type of serious effort needed on [the] complex issue" of nonsignatory enforcement of a delegation agreement. Rivera-Corraliza v. Morales, 794 F.3d 208, 224 (1st Cir. 2015). And "we will not do [Cultural Care's] work for [it]." Id.; see also Salmon v. Lang, 57 F.4th 296, 325 (1st. Cir. 2022) ("We have frequently emphasized

- 17 -

that judges are not obligated to do a party's work for him, 'searching sua sponte for issues that may be lurking in the penumbra of the motion papers' . . . . [particularly where] 'the underdeveloped argument raises complexities that defy an easy answer.'" (quoting Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st. Cir. 2010))). We therefore see no basis for concluding that the District Court erred in declining to send the issue of arbitrability to the arbitrator to decide.

**B.**

Cultural Care separately contends that, to the extent that the question of arbitrability is for the court to decide, the District Court erred under both federal and Swiss law in ruling that Cultural Care may not enforce the arbitration agreement that the ICL Contract contains. It thus contends that we must reverse the District Court's denial of its motion to compel arbitration for this reason alone.

In general, Cultural Care agrees, a party seeking to compel arbitration must show (1) "that a valid agreement to arbitrate exists"; (2) "that [it is] entitled to invoke the arbitration clause"; (3) "that the other party is bound by that clause"; and (4) "that the claim asserted comes within the clause's scope." InterGen, 344 F.3d at 142. We have cautioned, however, that, because "[a]rbitration is strictly 'a matter of consent,'" Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299

- 18 -

(2010) (quoting <u>Volt Info. Scis., Inc.</u> v. <u>Bd. of Trs. of Leland Stanford Junior Univ.</u>, 489 U.S. 468, 479 (1989)), courts should be careful "about forcing arbitration in 'situations in which the identity of the parties who have agreed to arbitrate is unclear,'" <u>InterGen</u>, 344 F.3d at 143 (quoting <u>McCarthy</u>, 22 F.3d at 355).

We do not understand Cultural Care to take issue with this proposition. That said, we agree with Cultural Care that nonsignatories may invoke arbitration agreements in certain circumstances. <u>See</u> <u>GE Energy</u>, 590 U.S. at 437. In particular, traditional principles of contract law permit a contract "to be enforced by or against nonparties to the contract through . . . 'third-party beneficiary theories,'" <u>Grand Wireless</u>, 748 F.3d at 12 (quoting <u>Arthur Andersen</u>, 556 U.S. at 631), and we agree that this general rule applies equally to an agreement to arbitrate.

So, we must address Cultural Care's contention that it may enforce the arbitration agreement in the ICL Contract as a third-party beneficiary. We are not persuaded.

**1.**

To make the case for its authority to enforce the arbitration agreement, Cultural Care relies in part on six provisions in the ICL Contract, which it says demonstrate its third-party beneficiary status.

Cultural Care acknowledges that these provisions refer only to ICL. But it argues that ICL "does not benefit" from them.

- 19 -

Cultural Care then goes on to explain that it, as "the actual State Department designee" that "oversees the au pairs[] . . . in the United States," is "the only possible intended beneficiary" of those provisions.

Cultural Care rounds out its case for being a third-party beneficiary by pointing to a seventh provision in the ICL Contract. We will refer to that provision, which is set forth in Paragraph 14 of the ICL Contract, as the "Release Clause."

The Release Clause provides that the au pair "release[s] and forever discharge[s] [ICL] and its affiliates . . . from any and all claims or causes of action . . . which arise out of illness, injury, damage or loss of any kind . . . resulting from or during participation in the [au pair program]." Cultural Care argues that the Release Clause is "expressly intended for [its] benefit" because it releases from liability ICL's "affiliates" and because it is an "affiliate[]" to which that clause refers. It thus argues that it is a third-party beneficiary "based on this provision alone."

Cultural Care then goes on to argue that, as a "third-party beneficiary of a contract containing an arbitration clause," InterGen, 344 F.3d at 146, it is entitled to invoke the arbitration agreement contained in that contract. Indeed, according to Cultural Care, the District Court committed "a category error" when it "ruled that Cultural Care could not move

to compel arbitration because it was not a third-party beneficiary of 'the arbitration provision' itself," rather than of the contract as a whole. As support, Cultural Care points to the District Court's statement that the arbitration agreement "does not even make an ambiguous reference that could be construed to include Cultural Care [] as a third-party beneficiary." Cultural Care contends that this focus on the text of the arbitration agreement was in error.

Cultural Care acknowledges that the text of the arbitration agreement is relevant to the separate issue of "whether the arbitration provision's scope specifically excludes Plaintiffs' claims against Cultural Care." But, according to Cultural Care, consideration of the text of the arbitration agreement is not germane to the third-party-beneficiary question because other contractual provisions already establish its status as a third-party beneficiary of the contract.

Thus, Cultural Care contends, the District Court was wrong to treat the question of its authority to enforce the arbitration agreement as turning on whether "the arbitration provision itself was intended to benefit Cultural Care." As we will next explain, however, Cultural Care's argument on this score does not hold up under our precedents.

**2.**

"The 'critical fact' that determines whether a nonsignatory is a third-party beneficiary is whether the underlying agreement 'manifest[s] an intent to confer specific legal rights upon [the nonsignatory].'" Ouadani v. TF Final Mile LLC, 876 F.3d 31, 39 (1st Cir. 2017) (alterations in original) (quoting InterGen, 344 F.3d at 147). The showing of a "mere benefit to [a] nonsignatory resulting from a signatory's exercise of its contractual rights is not enough." Id. Moreover, "[b]ecause third-party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to nonsignatories," a party "aspiring to such status" must demonstrate with "special clarity" that the signatories intended to confer upon it such a benefit. McCarthy, 22 F.3d at 362; see also Hogan, 914 F.3d at 38 (explaining that a party seeking to enforce an agreement to which it is not a signatory "faces a steep climb").

Cultural Care concedes that this "special clarity" requirement applies, McCarthy, 22 F.3d at 362, notwithstanding its contentions about Swiss law and its application here. Cultural Care also concedes that some of the contractual provisions that it identifies as showing its third-party-beneficiary status refer not to it, but to ICL.

Cultural Care nonetheless appears to assert that it can satisfy the "special clarity" test with respect to those six provisions because ICL "does not benefit" from them at all, making Cultural Care "the only possible intended beneficiary."[4] In support of this contention, Cultural Care argues that ICL "merely performs the 'identification, screening, and preparation of prospective au pairs' before their U.S. arrival." It thus appears to contend that, for this reason, ICL does not benefit from contractual provisions that relate to the au pair's actual participation in the program.

Setting aside the fact that at least one of the contractual provisions Cultural Care invokes does appear to refer to pre-departure screening, the bare assertion about ICL's role in the au pair program is insufficient to show that ICL derives no benefit from many of the contract's provisions. At a minimum, ICL would appear to benefit from "identif[ying]" prospective au pairs willing and able to abide by the specified terms and conditions. Given the ICL Contract's repeated references to ICL and its express statement that "[ICL] and the undersigned au pair . . . for good and valuable consideration . . . agree to the following terms and

_____

[4] We see no additional significance in Cultural Care's contention that "[this], no doubt, is why the contract refers to ICL as 'Cultural Care,' and not ICL." As the contract makes clear, "Cultural Care" is simply the registered business name of International Care, Ltd., the Swiss company that Cultural Care does not dispute is an independent and distinct corporate entity.

- 23 -

conditions," we simply cannot say, without more, that ICL derives no benefit from the identified provisions.

We note, too, that even if Cultural Care does predictably "benefit from [the signatories'] performance of the contract," that fact alone does not establish its status as a third-party beneficiary.  McCarthy, 22 F.3d at 362 n.16; see also InterGen, 344 F.3d at 147 ("[A] benefitting third party is not necessarily a third-party beneficiary.").  For this reason as well, Cultural Care fails to persuade us that these six provisions demonstrate its third-party-beneficiary status.

### 3.

There is a further problem with Cultural Care's argument that it is entitled to enforce the arbitration agreement in the ICL Contract as a third-party beneficiary.  Even if Cultural Care could show that it is a third-party beneficiary of any or all of the six provisions addressed above, we still could not conclude, based on the arguments Cultural Care advances, that it is entitled to enforce the signatories' arbitration agreement.  And that is also true with respect to the one other contractual provision that Cultural Care invokes that arguably does refer to Cultural Care through its use of the word "affiliates": the Release Clause.[5]

---

[5] Because of these defects in Cultural Care's argument, we need not resolve whether the reference to "affiliates" in the Release Clause includes Cultural Care or whether Cultural Care is,

For starters, we note that, at times, Cultural Care appears to argue that so long as it is a third-party beneficiary of any provision in the ICL Contract, it is necessarily a third-party beneficiary of every provision in the ICL Contract and so, for that reason, the agreement to arbitrate itself. We know of no authority, however, that indicates that a third-party beneficiary of one contractual provision is necessarily a third-party beneficiary of (and thus entitled to enforce) any provision contained in the same contract. Nor does Cultural Care identify any such authority. Thus, we are not persuaded by this argument -- if it is the one that Cultural Care means to make -- for overturning the District Court's ruling.

We do acknowledge that Cultural Care may also mean to be making the distinct argument that, by virtue of the provisions that it identifies and its claimed relationship to them, it is a third-party beneficiary of the ICL Contract <u>as a whole</u>. It then appears to contend that, in consequence, it may enforce the arbitration agreement contained in that contract. But, if this is the argument that Cultural Care means to be making, for the reasons we will next explain, we also are unpersuaded.

---

by virtue of that reference, a third-party beneficiary of that agreement.

**a.**

As an initial matter, Cultural Care fails to cite to any case, as a matter of U.S. law, that supports the proposition that its claimed third-party relationship to the identified provisions of the ICL Contract makes it a third-party beneficiary "of [the] contract" as a whole. With respect to its contention that it is "a 'third-party beneficiary' based on th[e] [Release Clause] alone," for example, Cultural Care cites only to a single out-of-circuit case. See Allen v. The Katz Agency, Inc., 677 F.2d 193 (2d Cir. 1982). But that case says nothing about a third-party beneficiary of a release clause being a third-party beneficiary of a contract as a whole (nor, for that matter, does that case say anything about arbitration). See id. at 197 (concluding that the plaintiff was not retroactively entitled to additional compensation under his former employer's updated Employee Stock Ownership Plan because "[t]he Plan, though not specifically named, was effectively a third-party beneficiary of the release [contained] in [the] termination agreement" that the plaintiff executed with his employer).

Cultural Care's claim to be a third-party beneficiary "of the contract" is no more developed with respect to the six other contract provisions that it identifies. The only case that Cultural Care cites in that portion of its brief is Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1. But our decision in

Grand Wireless, which dealt with an agency relationship and not a third-party beneficiary relationship, id. at 9-11, is wholly inapposite.

There, we were simply applying a "uniformly" adopted "federal rule" that "an agent is entitled to the protection of her principal's arbitration clause when the claims against her are based on her conduct as an agent." Id. at 11. Because that agency theory is not applicable here, we cannot say based on that precedent that Cultural Care's arguments are sufficient to persuade us that it is a third-party beneficiary "of the [ICL] [C]ontract" as a whole.

**b.**

Cultural Care's argument faces a second problem. Contrary to its contentions, our precedent makes clear that the relevant question in determining whether a nonsignatory can enforce an arbitration agreement under a third-party-beneficiary theory is whether the signatories intended to "confer [on that third party] arbitration rights," not just any right under the contract. Hogan, 914 F.3d at 40 (emphasis added); see also id. (concluding that the defendant "was not an intended third-party beneficiary of the signatories' agreement to arbitrate"); Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, Inc., 795 F.2d 1111, 1117 (1st Cir. 1986) (rejecting nonsignatories' bid to compel arbitration based on the conclusion that the nonsignatories were

- 27 -

"not intended beneficiaries of the [contract's] arbitration clause"). Accordingly, we have explained that "even if [a nonsignatory] c[an] show an intent of the [contracting] parties to confer upon it some benefit unrelated to arbitration, the language of the arbitration clause would still be dispositive" as to their authority to enforce that provision. Hogan, 914 F.3d at 40.

Of course, other contractual provisions may bear on, or provide evidence of, the parties' intent with respect to arbitration. But, even still, the relevant question for the court remains whether the nonsignatory is an "intended third-party beneficiary of the signatories' agreement to arbitrate." Id.

Cultural Care does not cite any authorities that purport to displace this rule. Indeed, if anything, the only authorities that Cultural Care does cite in support of its position appear to undermine it.

For example, Cultural Care cites to the Restatement (Third) of the United States Law of International Commercial and Investor-State Arbitration § 2.3 (A.L.I. 2023). But, immediately following the portion that Cultural Care quotes, the Restatement expressly provides that "an arbitration agreement may apply to a third-party beneficiary only in one of two circumstances," id. § 2.3 cmt. f (emphasis added), neither of which approximates Cultural Care's position.

The first circumstance, consistent with Hogan, is when a court "find[s] that the signatories intended to confer on the third party a right to invoke the arbitration agreement." Id. (emphasis added); see also id. § 2.3 note f (explaining that "the essential element is the parties' intention, specifically whether the parties intended to grant rights under the arbitration agreement to a third party" (emphasis added)). The second circumstance -- not relevant here -- is when a "third-party beneficiary of a contract . . . seeks to enforce the contract" against a signatory or "invokes provisions of it," and, in doing so, may be bound by an arbitration agreement contained within it. Id. § 2.3 cmt. f.

Cultural Care does also cite to our decision in InterGen, 344 F.3d 134, as if that precedent supports its contention that a nonsignatory may enforce an arbitration agreement so long as it is a third-party beneficiary "of the contract." But we do not see how InterGen does so.

The issue in InterGen was whether the defendants could compel InterGen, a nonsignatory to the contracts containing the arbitration agreements, to arbitrate under those agreements. Id. at 146. We explained that a "threshold question" was "whether InterGen [wa]s a third-party beneficiary of the purchase orders" at issue. Id. We determined -- after looking to the text of the

- 29 -

arbitration agreements contained in those contracts -- that "[t]here [were] no third-party rights afforded to InterGen." Id.

InterGen did not hold, however, that the relevant issue for a nonsignatory seeking to enforce an arbitration agreement is something other than whether the signatories intended that it benefit from that agreement. And, to the extent that our references to the "purchase orders" in InterGen might have been ambiguous, our later decision in Hogan was clear that the relevant question remains whether the parties intended to confer the right to enforce the arbitration agreement on the third party.

For similar reasons, Cultural Care's appeal to our decision in Ouadani, 876 F.3d 31, is unavailing. True, we stated in that case that the nonsignatory had "fail[ed] to identify any language in the Agreement that c[ould] be read to provide [it] with 'specific legal rights.'" Id. at 39 (emphasis added). But that observation demonstrates no more than that a contract that evinces no intent to benefit a third party cannot be enforced by that party. Ouadani never addressed, in circumstances in which a contract does evince some intent "to confer upon [a third party] some benefit unrelated to arbitration," Hogan, 914 F.3d at 40, whether that party is necessarily a third-party beneficiary of the agreement to arbitrate. Hogan, however, made clear that the arbitration agreement itself is "dispositive" on this question.

Id.  We are therefore unpersuaded that the District Court erred by looking to the text of the arbitration agreement itself.

**4.**

In concluding that the District Court did not err, we have relied principally on the federal law cases that Cultural Care cites in its briefing, in light of its contention that "Swiss law is equivalent to federal common law for purposes of this case." Throughout its briefing, however, Cultural Care also cites to its expert's declaration regarding Swiss law as further support for its position.

Given Cultural Care's express concession that Swiss law is materially indistinguishable from federal law, we need not separately analyze its arguments as a matter of Swiss law. Nevertheless, we do note that our review of the portions of the expert's declaration on Swiss law that Cultural Care cites in its briefing does not persuade us that Cultural Care has shown that Swiss law, unlike federal law, requires the outcome that Cultural Care favors.

Much of the expert's declaration is dedicated to showing that a third-party beneficiary does not need to be expressly named in the contract, a consideration that is not inconsistent with our analysis.  In addition, the specific portions of the expert's declaration that Cultural Care highlights on appeal as support for its claim that it, not ICL, is the only possible beneficiary of

- 31 -

the ICL Contract, do not purport to turn on anything specific to Swiss law. To the contrary, they merely highlight certain features of this case that do not suffice to persuade us either that ICL derives no benefit from the ICL Contract or that Cultural Care is a third-party beneficiary of the contract in consequence of ICL deriving no benefit from the provisions in question.

Additionally, while Cultural Care's expert does opine that under Swiss law Cultural Care "is considered a third-party beneficiary with a right to enforce the arbitration clause" based on the rights afforded to Cultural Care by the Release Clause, the declaration does not identify any Swiss law precedent supporting that conclusion. The only case that the expert does identify that relates to nonsignatory enforcement based on a contractual release clause does not concern arbitration and therefore does not address whether such a nonsignatory would be entitled to enforce the parties' arbitration agreement.

Finally, Cultural Care cites to a decision by the Swiss Federal Supreme Court. But that case addresses a nonsignatory who brings a claim under the contract, and therefore does not reach the circumstances here. See Bundesgericht [BGer] [Federal Supreme Court] October 6, 2016, 4A_310/2016, ¶ 3.1.1 (Switz.).

Thus, insofar as Cultural Care means to suggest that Swiss law supports its position even if federal law does not -- notwithstanding its assertion that "Swiss law is equivalent

to federal common law for purposes of this case" -- it has not demonstrated that Swiss law does so. And, as we have explained, federal law does not itself provide such support.

**5.**

Cultural Care does further argue that "[a]ffirming the district court's order [regarding Cultural Care's failure to establish third-party-beneficiary status] would improperly discriminate against arbitration." That is so, it contends, because arbitration agreements are merely "a specialized kind of forum-selection clause." Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 (1974).

Cultural Care goes on to contend that "'non-signatories may be bound by a forum-selection clause if they are intended third-party beneficiaries of the contract,' not the forum selection clause itself" (quoting In re McGraw-Hill Glob. Educ. Holdings LLC, 909 F.3d 48, 59 (3d Cir. 2018)). It does not, however, develop this argument beyond a single citation to In re McGraw-Hill Global Education Holdings LLC, 909 F.3d 48, an out-of-circuit case. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that an undeveloped argument is waived). And, in any event, McGraw Hill does not support this asserted ground for overturning the District Court's decision. The court there declined to enforce the forum-selection clause, and, in doing so, specifically found "compelling" the fact that

- 33 -

the contract "d[id] not identify any third party in the[] choice of forum provisions." McGraw-Hill, 909 F.3d at 62. We therefore do not see how treating the text of an arbitration agreement as relevant to the question of its enforcement by a third party would improperly discriminate against arbitration.

**6.**

Because Cultural Care fails to persuade us that the District Court was wrong to ask whether the signatories to the ICL Contract intended to confer on it the right to compel arbitration, we must affirm the District Court's conclusion, based on its resolution of that question, that Cultural Care is not entitled to compel arbitration. That is so because Cultural Care makes no argument that, if that were the relevant question, the District Court would still have been wrong to conclude that the contract does not demonstrate with the necessary "special clarity" that Cultural Care is an "intended third-party beneficiary of the signatories' agreement to arbitrate." Hogan, 914 F.3d at 39-40.

In that regard, we note that, in objecting to the District Court's analysis of the third-party-beneficiary issue, Cultural Care raises no objection to the District Court's analysis of the arbitration provision itself or what the language of that provision demonstrates regarding the signatories' intent. The only argument that Cultural Care does advance concerning the text

of the arbitration agreement is that the plaintiffs' claims fall within its scope.

Even Cultural Care acknowledges, however, that the question of whether a particular dispute falls within the scope of an arbitration agreement is distinct from the question of whether a particular party is entitled to invoke that agreement. See InterGen, 344 F.3d at 143. And, significantly, the burdens to make these showings are distinct, as well.

A nonsignatory "faces a steep climb" to show that it may enforce an agreement to which it is not a party, Hogan, 914 F.3d at 38, and must, as we have noted, make that showing with "special clarity," id. at 39 (quoting McCarthy, 22 F.3d at 362). By contrast, "ambiguities as to the scope of [an] arbitration clause . . . [are] resolved in favor of arbitration." Volt, 489 U.S. at 476.

Thus, by advancing arguments about how to construe the arbitration agreement as if the issue of its third-party-beneficiary status is properly treated as one that concerns the agreement's scope, Cultural Care assumes the existence of a "policy favoring arbitration." Hogan, 914 F.3d at 38 (quoting McCarthy, 22 F.3d at 355). But application of such a policy "presumes proof of a preexisting agreement to arbitrate disputes arising between the protagonists." Id. (quoting McCarthy, 22 F.3d at 355). In the absence of such an agreement

between the protagonists here, however, Cultural Care must demonstrate with "special clarity" that the signatories to the ICL contract intended to confer upon it the authority to enforce the parties' arbitration agreement. Yet Cultural Care does not attempt to meet this burden while treating the language of the arbitration agreement as being relevant to the question.

Moreover, given the different standard applicable to evaluation of the arbitration agreement's scope, we cannot conclude from Cultural Care's arguments that it could make the showing necessary here. The District Court explained that the arbitration agreement "does not even make an ambiguous reference" to Cultural Care. It then also emphasized, pointing to our analysis of a similar arbitration agreement in Hogan, that although some provisions in the ICL Contract do reference "affiliates" and "staff in the United States," the arbitration agreement notably contains no such reference. Instead, the arbitration agreement mentions only the "parties" and ICL's successors and assignees, none of which include Cultural Care. See Hogan, 914 F.3d at 40 (emphasizing the fact that the contract "references SBS's 'customers' in other sections, yet omits that reference in the arbitration clause" as evidence that the parties did not intend to confer on the defendant, as a customer of SBS, the right to compel arbitration).

Indeed, our cases have consistently relied on the absence of a reference to an otherwise identified third party in a contract's arbitration provision as evidence that the signatories did not intend to confer arbitration rights on that third party. See, e.g., Mowbray, 795 F.2d at 1118 ("[B]ecause the drafters specifically included the introducing firm in certain provisions, and because the introducing firm was not included in the arbitration clause, we believe the reasonable inference to be that the parties did not intend defendants-appellees, the introducing firm, to be a beneficiary of the arbitration clause."); Cortés-Ramos v. Martin-Morales, 894 F.3d 55, 60 (1st Cir. 2018) (relying on the reasoning from Mowbray to conclude that the defendant "was not an intended third-party beneficiary of the parties' agreement to arbitrate"). Cultural Care's failure to provide any explanation as to why -- setting aside, of course, the arguments already addressed above that we find unpersuasive -- the contract nonetheless evinces with "special clarity" the signatories' intent to confer upon Cultural Care arbitration rights is thus dispositive. Accordingly, we conclude that Cultural Care has not made the showing necessary to demonstrate its entitlement to compel arbitration as a third-party beneficiary of the arbitration agreement in the ICL Contract.

**V.**

Cultural Care alternatively argues that it is entitled to enforce the arbitration agreement under the doctrine of equitable estoppel. See GE Energy, 590 U.S. at 445; see also P.R. Fast Ferries LLC v. SeaTran Marine, LLC, 102 F.4th 538, 549 (1st Cir. 2024) (discussing estoppel). "Generally, in the arbitration context, 'equitable estoppel allows a nonsignatory to a written agreement containing an arbitration clause to compel arbitration where a signatory to the written agreement must rely on the terms of that agreement in asserting its claims against the nonsignatory.'" GE Energy, 590 U.S. at 437 (emphasis added) (quoting 21 R. Lord, Williston on Contracts 200 (4th ed. 2001)); see also Sourcing Unlimited, 526 F.3d at 47 ("Federal courts 'have been willing to estop a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" (emphasis omitted) (quoting InterGen, 344 F.3d at 145)). The purpose of applying equitable estoppel in such cases is to "preclude[] a party from enjoying the rights and benefits under a contract while at the same time avoiding its burdens and obligations." InterGen, 344 F.3d at 145.

In determining whether claims are "sufficiently intertwined" with a contract containing an arbitration agreement, P.R. Fast Ferries LLC, 102 F.4th at 550, courts have generally

- 38 -

required the claims to be "integrally related to the contract containing the arbitration clause," id. (quoting Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773, 779 (2d Cir. 1995)).  We have found such a relationship to exist where "resolution of the [signatory's] claims against the nonsignatory 'require[d] reference to and [was] in part based on the underlying [contract].'"  Id. (second and third alterations in original) (quoting Sourcing Unlimited, 526 F.3d at 47).  By contrast, we have explained that equitable estoppel is not warranted where "the plaintiff's claims would exist in the absence of the contract."  Id. at 550 n.10 (citing Hogan, 914 F.3d at 42).

Cultural Care contends that equitable estoppel is appropriate here because the "policies and powers" that the plaintiffs assert give Cultural Care control over their "conditions of employment" -- and would therefore establish an employment relationship -- "all stem from [the] ICL [C]ontract." Cultural Care points to various provisions of the ICL Contract, including the requirement that plaintiffs "submit" certain materials to ICL, which ICL then uses to "make a suitable host family match" for them, and a provision of the contract that reserves to ICL "the exclusive right to determine [the plaintiffs'] suitability for acceptance and . . . continued participation in the Program."  Cultural Care further emphasizes that the ICL Contract spells out the plaintiffs' agreement to "stay[] within

- 39 -

the legal number of working hours per day and week," to "perform child care responsibilities," and to "participat[e] in all child safety and child development training and orientation sessions."

These observations about the ICL Contract do not persuade us. The plaintiffs' claims do not "directly . . . invoke" the terms of the contract, Sourcing Unlimited, 526 F.3d at 47, either to challenge those terms or to enforce a right created therein, see, e.g., Hogan, 914 F.3d at 42 (noting that the plaintiff in that case "d[id] not claim any benefit or right from [the defendant] arising from the [contract]"). Nor are we persuaded that the resolution of the plaintiffs' claims against Cultural Care "depend on," Ouadani, 876 F.3d at 40, or "require[] reference to," P.R. Fast Ferries LLC, 102 F.4th at 550 (quoting Sourcing Unlimited, 526 F.3d at 47), the plaintiffs' contract with ICL.

The District Court rightly determined that it "is entirely possible that the plaintiffs' claims -- which are all statutory in nature -- could proceed without any reference to the [ICL] Contract." Whether Cultural Care exercises control over the plaintiffs' employment in a manner that renders Cultural Care their employer for the purpose of federal and state wage-and-hour laws will turn, as the plaintiffs contend, on whether Cultural Care in fact "exercises the control typically exercised (or performs the roles typically performed) by an employer."

After all, the plaintiffs' claimed employment relationship is with Cultural Care, not ICL, and the ICL Contract by its terms is an agreement reached solely between the au pair and ICL. Thus, because we do not see how the analysis of whether the relationship between the plaintiffs and Cultural Care is one of employment depends on the terms of the ICL Contract, we see no reason to reject the plaintiffs' contention that their "claims would exist in the absence of the contract," a factor that we found to be dispositive in explaining why equitable estoppel was not warranted in Hogan. P.R. Fast Ferries LLC, 102 F.4th at 550 n.10 (citing Hogan, 914 F.3d at 42).

In that case, the plaintiff entered a contract (containing an arbitration agreement) with SBS, a staffing company that "assigned him to perform services for SPAR," a defendant in that case. Hogan, 914 F.3d at 36. SBS was "'affiliate[d]' to SPAR," but it was "not a subsidiary of or controlled by SPAR." Id. SPAR was supplied with "substantially all" of its "Field Specialists" in this way. Id.

The plaintiff brought suit against SBS and SPAR claiming violations of the FLSA as well as state wage-and-hour laws. Id. at 37. Both defendants moved to compel arbitration based on the plaintiff's contract with SBS. Id. SPAR contended, among other things, that, even though it was not a signatory to that contract, the plaintiff was "equitably estopped from avoiding arbitration

- 41 -

because his claims against SPAR [were] 'intertwined' with the [SBS contract] and because SPAR and SBS . . . are 'closely related.'" Id. at 40.

We rejected that contention by SPAR on the ground that it could not satisfy the "'intertwined' requirement for purposes of applying equitable estoppel." Id. at 42. In doing so, we distinguished Hogan from cases in which the plaintiff's claims "'derive[d] from benefits' [that it] alleged were due [to it] under the [contract in question]." Id. (first alteration in original) (quoting Sourcing Unlimited, 526 F.3d at 48). We explained that, by contrast, the plaintiff's claims in Hogan for "unpaid wages and benefits" were "premised upon [statutory] wage and hour law, not the [contract at issue]." Id. The success of those statutory claims therefore turned on "the nature of the services that [the plaintiff] provided to SPAR," and would "exist even if the [contract] were declared void." Id.

The circumstances here are nearly indistinguishable from the factors we found relevant in Hogan. Thus, as in Hogan, we conclude that there is no basis for applying equitable estoppel in this case. Cultural Care therefore has not shown that it is entitled to compel arbitration based on the ICL Contract.

## VI.

The District Court's denial of the motion to compel arbitration is **affirmed**.